UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZANE M. HUBBARD,<br><br>                    Plaintiff,<br><br>          v.<br><br>GLORIA RAMOS,<br><br>                    Defendant. | Case No. 19-cv-07508-JST<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S SUR-OPPOSITION**<br><br>Re: ECF Nos. 29, 35 |

Plaintiff, an inmate at Salinas Valley State Prison (SVSP), filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against SVSP psychiatrist Dr. Gloria Ramos.  Now pending before the Court is Defendant's motion for summary judgment on the claim that Defendant medicated Plaintiff without his consent in violation of the Fourteenth Amendment.  ECF No. 29.  Plaintiff has filed an opposition, and Defendant has filed a reply.  ECF Nos. 30, 32.  Plaintiff also filed a "Return to Defendant's Reply to Plaintiff's Opposition," ECF No. 33, which Defendant seeks to strike as an unauthorized sur-opposition.  ECF No. 35.  For the reasons set forth below, the Court GRANTS Defendant's summary judgment motion and DENIES AS UNNECESSARY Defendant's motion to strike Plaintiff's sur-opposition.  ECF Nos. 29, 35.

**DISCUSSION**

## I.      FACTUAL BACKGROUND

The following facts are taken from Plaintiff's Complaint, the summary judgment briefing and supporting declarations, and records subject to judicial notice.  ECF Nos. 1, 29, 29-1, 29-3, 29-4, 29-5, 30.  These facts are undisputed unless otherwise indicated.

Plaintiff was admitted to California Department of Corrections and Rehabilitation (CDCR)

United States District Court
Northern District of California

custody in 2011.[1]  In 2018, Plaintiff was criminally charged with violations of California Penal Code section 4501.5, battery by a person confined to state prison upon a person not confined to state prison, and was certified to the Sacramento County Superior Court pursuant to California Penal Code section 1368 et seq. for a competency determination.  ECF No. 29-1 at 4.[2]  On July 27, 2018, *pro tempore* judge Kevin McCormick of the Sacramento County Superior Court suspended the criminal proceedings and committed Plaintiff to the custody of the Department of State Hospitals to be treated at the Salinas Valley Psychiatric Program.  *Id.* at 4-7.  The superior court found that Plaintiff "lacks the capacity to make medication decisions, has a mental disorder that requires medical treatment with antipsychotic medication, and, if not treated with medication, it is probable that serious harm to [Plaintiff's] physical or mental health will result.  On this basis, antipsychotic medication may be administered to defendant."  *Id.* at 5.  The superior court ordered initial and subsequent periodic reporting by the Department of State Hospitals regarding Plaintiff's progress towards competence, and capped Plaintiff's hospital commitment term at three years, "until [he] is restored to sanity or is found to be unlikely to regain mental competence in the foreseeable future."  *Id.* at 6.

On June 4, 2019, Judge Sharon Lueras of the Sacramento County Superior Court issued an ex-parte minute order "for involuntary meds": "The Court ORDERED INVOLUNTARY MEDS to be administered to the Defendant at time of commitment of Defendant Zane Hubbard.  This minute order reiterates the previous order of July 18, 2018."  *Id.* at 9.  While Defendant claims Judge Lueras "ordered involuntary medication to be administered to Plaintiff, reiterating Judge McCormick's July 2018 order, and extending the order for one year," ECF No. 29 at 10, the record before the Court does not make that clear.  Judge Lueras's minute order contains no explicit findings or time frame; further, the Judge McCormick order submitted by Defendant is dated July

---

[1] The Court takes judicial notice of this fact from the public-record CDCR Inmate Locator, available at https://inmatelocator.cdcr.ca.gov/.  *See United States v. Basher*, 629 F.3d 1161, 1165 n.2 (9th Cir. 2011) (taking judicial notice of Bureau of Prisons inmate locator).

[2] The Court takes judicial notice of the state court records submitted by Defendant as Exhibits A, B, and C to ECF No. 29-1, Defendant's Request for Judicial Notice in Support of Motion for Summary Judgment.  *See* Fed. R. Evid. 201; *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (taking judicial notice of state court proceedings).

27, 2018, rather than July 18, 2018.  Additionally, it is not clear why Defendant would have needed to initiate involuntary medication proceedings in October 2019 before an administrative law judge, as described below, if Plaintiff were already ordered to be involuntarily medicated from June 2019 through June 2020 by Judge Lueras.

On October 14, 2019, Defendant initiated an Emergency Involuntary Medication Petition, seeking to involuntarily medicate Plaintiff after seeing him twice on that day, both before and after Plaintiff assaulted another inmate.  ECF No. 29-5 (Ramos Decl.) at 1-3.  Plaintiff does not dispute that he assaulted the other inmate; he contends that he did so because the "aversive therapy" that he has been receiving since 2013 "at times . . . is very intense and when placed in a[n] incompatible environment, it can cause [him] to assault someone," and he is "currently housed in an incompatible environment."  ECF No. 1 at 4.  Defendant also submitted a "Request to Administer Emergency Medication Pending Penal Code 2602 Hearing."  ECF No. 29-5 at 3, 10.  Defendant alleges that she "ordered emergent injectable medications due to Plaintiff's refusal of emergent oral medications," but Plaintiff "eventually agreed" to take oral anti-psychotic medication rather than receive involuntary injections while the petition was pending.  *Id.* at 3-4.

Defendant submitted a declaration in support of the involuntary medication petition in which she indicated that Plaintiff has schizophrenia and noted:

> Mr. Hubbard is overtly psychotic; he exhibits disorganized thoughts and speech in the form of thought perseverance and circumstantiality. He appears at times to be internally preoccupied and responding to internal stimuli, holding meaningful and sensical conversation is hard due to rambling speech; his mood is easily irritated when asked questions pertaining to [mental health]; his thought process is circumstantial, with perseveration on persecutory ideas; his thought content is centered on persecutory delusions; judgments [and] insight are impaired. He has stated "I don't have a mental illness" (poor insight), and "I have the right to hit someone if they disrespect me" (poor judgment).

> A court-appointed psychologist evaluated Mr. Hubbard on two separate occasions. On 5/3/2018, he evaluated Mr. Hubbard for competency to represent himself in court, and found him to be incompetent because the severity of his symptoms interfered with his ability to present a rational defense. On 6/21/18, he evaluated Mr. Hubbard again, for competency to stand trial, and Mr. Hubbard reportedly described detailed, complex, and fixed delusional beliefs regarding a conspiracy against him involving the prison system, Catholic Church, and the government in general.

ECF No. 29-5 at 7.  Defendant also noted Plaintiff's "extensive history of violence" including "assaultive behavior towards inmates, and towards staff," and prior crimes, as well as his "history of paranoia around being persecuted for his ethnicity" and history of medication non-compliance. *Id.* at 7, 9.

Defendant described the October 14 incident:

> Mr. Hubbard had just seen this provider for psychiatry follow up, and while escorted in the hallway, he was passing by another inmate, whom Mr. Hubbard suddenly punched in face with his right hand. The other inmate fell on the floor, and his lip split open for which he received 3 stitches later on . . . Mr. Hubbard got irritable, angry, and argumentative with this provider when this provider questioned him regarding assaultive behavior. He stated several times "I have the right to get angry and be angry; I have the right to hit someone if they disrespect me," and minimized the seriousness of the recent assaultive behavior by focusing on his right to be physically aggressive. Mr. Hubbard blamed the other inmate for having called him the "b word" a couple months ago. When this provider recommended medication, he quickly became belligerent and threatening, stating "I'm not taking any medications; you'll see what I'll do!"

*Id.* at 8.

Plaintiff disputes Defendant's version of the October 14 events, stating:

> On October 14th, 2019 during Miss Ramos's initial interview of me before the assault, I had grown irritated with Miss Ramos because she was unconcerned with my reasons for § 1370 incompetency, here, her only concern was medicating me for a statement that I gave to the evaluating psychologist in Sacramento, California. She could not possibly prescribe medication if she did not know what she was treating me for. Irritated by this, after the assault, when she explained she would be placing me on Kaheya [sic] I became angry because I knew that was Miss Ramos's agenda. I did not say, "I have the right to hit someone if I get mad!" That statement is fabricated. I did say, "I have the right to get mad!"
> . . .
> . . . Once the assault was complete, the situation was pacified. An admonition would have sufficed from Miss Ramos. I've had a history of assaults on inmates and would be disciplined with rules violation reports and loss of privileges. I have never been forced medication for an assault.
>
> Miss Ramos made her testimonies appear like I am gravely disabled, and because of this, I do not agree with her opinion.

ECF No. 30 at 3-4.

Defendant also noted in her supporting declaration that she had explained the risks,

4

1   benefits, and alternatives to Plaintiff, who "refused, does not have the capacity, or could not accept

2   psychiatric medications"; that she anticipated improvements to his delusions and hostility with

3   medication; and that side effects could include metabolic symptoms and muscle spasms.  ECF No.

4   29-5 at 8-9.  She opined that "[w]ithout medication, [Plaintiff] would present as an elevated

5   chronic risk, and imminent risk, or both."  *Id.*

6        Defendant reiterated the events of October 14 and Plaintiff's history of violent behavior in

7   the request to administer emergency medication pending the hearing, averring that in her

8   professional opinion "care of the patient is best served by starting medications now and to

9   continue them pending the full hearing," that emergency medication was begun "[a]fter

10   determining that a clinical emergency existed which threatened the patient's health" and that

11   "emergency conditions that were previously observed are likely to recur" absent continued

12   medication.  *Id.* at 10.

13        An Institutional Treatment Team Profile documented Plaintiff's treatment history and

14   noted that "[w]ithout psychotropic medication Mr. Hubbard will continue to be [a danger to

15   others]."  *Id.* at 12.

16        Plaintiff was served the petition on October 16, 2019, along with the name and contact

17   information for his attorney for the hearing.  *Id.* at 3.

18        Plaintiff's involuntary medication hearing pursuant to California Penal Code section 2602

19   took place on October 23, 2019.  *Id.* at 4.  The administrative law judge found that Plaintiff was a

20   danger to others without medication, and authorized involuntarily administered psychiatric

21   medication for a period of one year.  ECF No. 29-1 at 12-13.  Plaintiff received monthly

22   involuntary injections for one year.  ECF No. 29-5 at 4.  Defendant opined that "this medication

23   helped Plaintiff integrate into the program, and prevented any further assaults upon others by

24   Plaintiff."  *Id.*

25        As of May 4, 2021, when Defendant took Plaintiff's deposition, Plaintiff was no longer

26   receiving involuntary medication.  ECF No. 29-3 at 11, 13-14.

27        **A.      CDCR Administrative Grievance Process**

28        During the relevant time period, the California Department of Corrections and

United States District Court
Northern District of California

5

United States District Court
Northern District of California

1  Rehabilitation ("CDCR") provided inmates with the following administrative remedies, also

2  referred to as the administrative grievance process.[3]  The CDCR provided its inmates the right to

3  appeal administratively "any policy, decision, action, condition or omission by the department or

4  its staff that the inmate or parolee can demonstrate as having a material adverse effect upon his or

5  her health, safety or welfare."  15 Cal. Code Regs. § 3084.1(a).  Grievance issues are separated

6  into two categories: custody issues and healthcare issues.

7          To grieve a custody issue, a prisoner submits his complaint on a CDCR Form 602 and

8  describes the specific issue being grieved and the relief requested.  15 Cal. Code Regs. § 3084.2(a)

9  (2018).  The prisoner must state all facts known and available to him regarding the issue being

10  grieved at the time of submission; and list all staff members involved and describe their

11  involvement in the issue.  15 Cal. Code Regs. § 3084.2(a)(1), (4) (2018).  To exhaust available

12  administrative remedies for custody grievances, a prisoner must have his grievance proceed

13  through three levels of review: (1) a first formal level filed with one of the institution's appeal

14  coordinators, (2) a second formal level filed with the institution head or designee, and (3) a third

15  formal level filed with the CDCR director or designee.  15 Cal. Code Regs. § 3084.7 (2018).

16  Pursuing a grievance through the third and final level satisfies the exhaustion requirement set forth

17  in 42 U.S.C. § 1997e(a).  15 Cal. Code Regs. § 3084.1(b) (2018).

18          To grieve a healthcare issue, a prisoner submits his complaint on a CDCR Form 602 HC

19  and "explain[s] the decision, action, condition, omission, policy, or regulation that has had a

20  material adverse effect upon [his[ health and welfare for which [he] seek[s] administrative

21  remedy."  15 Cal. Code Regs. §§ 3999.226, 3999.277(a) (2018).  The prisoner must state all facts

22  known and available to him regarding the issue being grieved at the time of submission; and must

23  also identify all staff member(s) involved.  15 Cal. Code Regs. § 3999.226(g) (2018).  Healthcare

24  _____

25  [3] The regulations governing the administrative grievance process for California prisoners
    underwent a substantial restructuring in 2020.  On March 25, 2020, and effective June 1, 2020,

26  California Code of Regulations, Title 15, sections 3084 through 3084.9 were repealed and
    replaced with renumbered and amended provisions at sections 3480 through 3487.  Because the

27  alleged excessive force incident took place in 2017, the current administrative grievance process
    does not apply to Plaintiff's claims.  All the citations in this order to the California regulations are

28  to the regulations in place during the period relevant to this action, rather than to the current
    regulations.

1
2
3
4

grievances are subject to two levels of review: an institutional level of review and a headquarters level of review.  15 Cal. Code Regs. § 3999.226(a)(1) (2018).  A headquarters' level review exhausts the prisoner's administrative remedies for the healthcare grievance.  15 Cal. Code Regs. §§ 3087.5(h), 3999.230 (2018).

5

### B.    Plaintiff's Grievances

6
7
8
9
10

Plaintiff maintains that he filed four administrative appeals related to the involuntary medication, "as a prerequisite to preventing the assault" on the other inmate, asking "to restrict my interactions with inmates."  ECF No. 1 at 5.  He alleges that the appeals "were denied on the grounds that I would not be force medicated."  *Id.*   He lists log numbers SAC-O-18-03136, SAC-H-18-03020, SVSP-HC-19000317, and SVSP-HC-19000307.  *Id.*

11
12
13
14
15
16

In appeal log SAC-O-18-03136, dated August 27, 2018, Plaintiff challenged the Sacramento County Superior Court's order of hospitalization and medication.  ECF No. 30 at 10.  The appeal was screened at the first level on August 13, 2018 and returned to Plaintiff as "not an appeal" because "Sacramento Superior Court is not under the jurisdiction of CDCR."  *Id.* at 9.  It was later screened again and cancelled on November 26, 2018, because "[t]he action or decision being appealed is not within the jurisdiction of the apartment."  *Id.* at 7.

17
18
19
20

In appeal log number SAC-H-18-03020, Plaintiff submitted a reasonable accommodation request asking for "an order from the director opposing the court order and use of departmental facilities" related to the order of hospitalization and medication.  *Id.* at 17.  The Reasonable Accommodation Panel (RAP) responded that the matter was not an access issue.  *Id.* at 16.

21
22
23
24
25
26
27
28

In appeal log number SVSP-HC-19000317, dated March 10, 2019, Plaintiff challenged the superior court's decision to hospitalize and medicate him.  *Id.* at 21.  He stated: "I contend that this hospitalization and forced medication will be harmful to my health because I am not mentally incompetent."  *Id.* at 23.  The Institutional Level Response, dated May 20, 2019, informed Plaintiff that only the judge could decide when he would leave the Psychiatric Inpatient Program (PIP), and that his medication was voluntary and he could refuse it.  *Id.* at 25-26.  The Headquarters' Level Response, dated July 23, 2019, informed Plaintiff that he had the "opportunity to access mental health services and clinical staff regarding your stated issues," and

United States District Court
Northern District of California

1   that he would continue to receive mental health treatment, and encouraged him to "work with your

2   clinicians and the Health Care Grievance Office . . . to provide information that is not duplicative."

3   *Id.* at 19-20.

4         In appeal log number SVSP-HC-19000307, filed on March 12, 2019, Plaintiff expressed

5   his "[d]isagreement with primary care provider prescribing him psychotropic medications."  ECF

6   No. 29-4 at 9.  The Headquarters' Level response was dated July 23, 2019.  *Id.*

7         Defendant submitted a declaration from Chief of the Health Care Correspondence and

8   Appeals Branch (HCCAB) S. Gates stating that Plaintiff filed 31 health care grievances between

9   December 2017 and November 2019, of which seven related to involuntary medication.[4]  ECF No.

10   29-4 at 1-3.  Of the seven, S. Gates determined that SVSP HC 19001181 "concerns the issues

11   raised in this case."  *Id.* at 3.

12         In Appeal log number SVSP HC 19001181, dated October 15, 2019, Plaintiff wrote that

13   "On 10-14-2019 Doctor Ramos ordered me involuntarily medicated after I engaged in an

14   altercation with another inmate.  The situation is under control, and Doctor Ramos continues to

15   force medication beyond . . . regulations . . . I request termination of the medication."  ECF No.

16   29-4 at 21.  The Institutional Level Response, dated December 23, 2019, informed Plaintiff that he

17   was "given due process with the PC 2602 proceedings" and was being medicated pursuant to court

18   order through October 23, 2020.  *Id.* at 23.  Plaintiff appealed, writing, "Dr. Ramos is forcing

19   medication on me to punish me, not because I'm suffering a mental illness. If the medication is not

20   terminated, I will take it as a threat to my health and safety."  *Id.* at 22.  The Headquarters' Level

21   Response, dated February 13, 2020, informed Plaintiff that the Institutional Level response

22   "adequately addressed your health care grievance issue regarding involuntary medication

23

24   —————————————

[4] S. Gates identified the following seven appeals related to involuntary medication:
25        1. SVSP HC 19001269 (filed November 14, 2019)
     2. SVSP HC 19001181 (filed October 17, 2019)
26        3. SVSP HC 19000808 (filed July 12, 2019)
     4. SVSP HC 19000317 (filed March 18, 2019)
27        5. SVSP HC 19000342 (filed March 18, 2019)
     6. SVSP HC 19000307 (filed March 12, 2019)
28        7. SAC HC 18001695 (filed September 25, 2018)
ECF No. 29-4 at 1-3.

United States District Court
Northern District of California

administration and is sustained at the headquarters' level of review." *Id.* at 19.

In his opposition to Defendant's motion for summary judgment, Plaintiff acknowledges that he "did not wait to exhaust [his] administrative remedies" because he believed his health and safety were in jeopardy from the psychiatric medication. ECF No. 30 at 2. He also notes that his "appeals from September 2018 to November 2019 are irrelevant to this matter" and "refer to something else." *Id.* at 3.

## II.     LEGAL STANDARDS

### A.     Summary Judgment

Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a) (2014). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id.*

A court shall grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial [,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file, 'designate 'specific facts showing that there is a genuine issue for trial.'" *See id.* at 324 (citing Fed. R. Civ. P. 56(e)).

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

9

1    The court's function on a summary judgment motion is not to make credibility determinations or

2    weigh conflicting evidence with respect to a disputed material fact.  *See T.W. Elec. Serv., Inc., v.*

3    *Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

4         **B.      Qualified Immunity**

5         Qualified immunity is an entitlement, provided to government officials in the exercise of

6    their duties, not to stand trial or face the other burdens of litigation.  *Saucier v. Katz*, 533 U.S. 194,

7    200 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  The

8    doctrine of qualified immunity attempts to balance two important and sometimes competing

9    interests: "the need to hold public officials accountable when they exercise power irresponsibly

10   and the need to shield officials from harassment, distraction, and liability when they perform their

11   duties reasonably."  *Pearson*, 555 U.S. at 231.  The doctrine thus takes into account the real-world

12   demands on officials in order to allow them to act "swiftly and firmly" in situations where the

13   rules governing their actions are often "voluminous, ambiguous, and contradictory."  *Mueller v.*

14   *Auker*, 576 F.3d 979, 993 (9th Cir. 2009).  "The purpose of this doctrine is to recognize that

15   holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make

16   difficult decisions in challenging situations, thus disrupting the effective performance of their

17   public duties."  *Id.*

18        To determine whether a government official is entitled to qualified immunity, the Court

19   must consider (1) whether the official's conduct violated a constitutional right, and (2) whether

20   that right was clearly established at the time of the incident.  *Pearson*, 555 U.S. at 232.  Courts are

21   not required to address the two qualified immunity issues in any particular order, and instead may

22   "exercise their sound discretion in deciding which of the two prongs of the qualified immunity

23   analysis should be addressed first in light of the circumstances in the particular case at hand."  *Id.*

24   at 236.  With respect to the second prong of the qualified immunity analysis, the Supreme Court

25   has recently held that "[a]n officer cannot be said to have violated a clearly established right unless

26   the right's contours were sufficiently definite that any reasonable official in his shoes would have

27   understood that he was violating it, meaning that existing precedent . . . placed the statutory or

28   constitutional question beyond debate."  *City and County of San Francisco, Cal. v. Sheehan*, 135

S. Ct. 1765, 1774 (2015) (omission in original) (internal quotation marks omitted).  This is an "exacting standard" which "gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation and alteration marks omitted).  A court determining whether a right was clearly established looks to "Supreme Court and Ninth Circuit law existing at the time of the alleged act." *Community House, Inc. v. Bieter*, 623 F.3d 945, 967 (9th Cir. 2010) (citing *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996)).  "The right must be settled law, meaning that it must be clearly established by controlling authority or a robust consensus of cases of persuasive authority." *Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019).  It is not necessary that a prior decision rule "the very action in question" unlawful for a right to be clearly established. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  The Supreme Court has repeatedly cautioned, however, that courts should not define clearly established law at a high level of generality.  *See White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam); *see also Hamby v. Hammond*, 821 F.3d 1085, 1095 (9th Cir. 2016) (plaintiff need not find case with identical facts, but the further afield existing precedent lies the more likely that official's acts fall within vast zone of conduct that is constitutional).

### C.    Exhaustion

The Prison Litigation and Reform Act (PLRA) requires exhaustion of all available administrative remedies prior to filing suit in federal court.  42 U.S.C. § 1997e(a).  A prisoner may not exhaust administrative remedies during the pendency of a complaint; federal courts are required to dismiss such a complaint without prejudice. *McKinney v. Carey*, 311 F.3d 1198, 1200 (9th Cir. 2002).  A prisoner may, however, exhaust new related claims that arise after filing a complaint and subsequently file an amended complaint to include the new exhausted claims. *Rhodes v. Robinson*, 621 F.3d 1002, 1007 (9th Cir. 2010).

The PLRA's exhaustion requirement is mandatory. *Jones v. Bock*, 549 U.S. 199, 211 (2007).  The administrative remedies need not be plain, speedy, and effective; need not satisfy minimum federal standards, and need not be capable of providing the form of relief sought. *Ross v. Blake*, 136 S. Ct. 1850, 1858, (2016) (citing to *Porter v. Nussle*, 534 U.S. 516, 524 (2002) and

1   *Booth v. Churner*, 532 U.S. 731, 741 (2001)).

2       The PLRA requires "proper exhaustion" of available administrative remedies. *Woodford*

3   *v. Ngo*, 548 U.S. 81, 93 (2006). Proper exhaustion requires using all steps of an administrative

4   process and "demands compliance with an agency's deadlines and other critical procedural rules

5   because no adjudicative system can function effectively without imposing some orderly structure

6   on the course of its proceedings." *Id.* at 90–91. Compliance with prison grievance procedures is

7   all that is required by the PLRA to "properly exhaust." *Jones*, 549 U.S. at 217–18. The level of

8   detail necessary in a grievance to comply with the grievance procedures will vary from system to

9   system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the

10   boundaries of proper exhaustion. *Id.* at 218.

11       Where a prison's grievance procedures do not specify the requisite level of factual

12   specificity required in the grievance, a grievance suffices if it alerts the prison to the nature of the

13   wrong for which redress is sought. *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009). The

14   grievance should include sufficient information "to allow prison officials to take appropriate

15   responsive measures." *Id.* (citation and internal quotation omitted) (no exhaustion where

16   grievance complaining of upper bunk assignment failed to allege, as complaint had, that nurse had

17   ordered lower bunk but officials disregarded that order). The grievance need not include legal

18   terminology or legal theories, because the primary purpose of a grievance is to alert the prison to a

19   problem and facilitate its resolution, not to lay the groundwork for litigation or provide personal

20   notice to a particular official that he may be sued. *Reyes v. Smith*, 810 F.3d 654, 659 (9th Cir.

21   2016). If an inmate's grievance does not comply with a procedural rule but prison officials decide

22   it on the merits anyway at all available levels of administrative review, it is exhausted. *Id.* at 656,

23   658 (although plaintiff's grievance did not name prison doctors sued in federal action contrary to

24   rule requiring inmates to name all staff members involved, grievance exhausted administrative

25   remedies because grievance plainly put prison officials on notice of nature of wrong alleged in

26   federal action – denial of pain medication by defendant doctors – and prison officials easily

27   identified named prison doctors involved).

28       Failure to exhaust under the PLRA is an affirmative defense that the defendant must plead

*United States District Court*
*Northern District of California*

12

1    and prove.  *Jones*, 549 U.S. at 204, 216.  The defendant's burden is to prove that there was an

2    available administrative remedy and that the prisoner did not exhaust that available administrative

3    remedy.  *Albino v. Baca*, 747 F.3d 1162, 1171 (9th Cir. 2014).  Once the defendant has carried that

4    burden, the burden shifts to the prisoner to come forward with evidence showing that there is

5    something in his particular case that made the existing and generally available administrative

6    remedies effectively unavailable to him.  *Id.* at 1172.  A prisoner must provide evidence, not just

7    make conclusory allegations, to meet his burden to show that existing and generally available

8    administrative remedies were effectively unavailable.  *See Draper v. Rosario*, 836 F.3d 1072,

9    1079-80 (9th Cir. 2016).  But as required by *Jones*, the ultimate burden of proof remains with the

10   defendant.  *Albino*, 747 F.3d at 1172.

11   **III.    ANALYSIS**

12        **A.    Exhaustion of Available Remedies**

13        It is undisputed that Plaintiff only submitted one grievance regarding Defendant's role in

14   his involuntary medication—log number SVSP HC 19001181.  Plaintiff received a final,

15   Headquarters' Level Response with respect to that appeal on February 13, 2020.  ECF No. 29-4 at

16   19.  He filed the Complaint in this case on November 14, 2019.  ECF No. 1.

17        Plaintiff contends that he filed suit before exhausting because he believed his health and

18   safety were in jeopardy.  The CDCR regulations in place at the time provided for a shorter

19   processing time for "[e]mergency appeals" where "regular appeal time limits would subject the

20   inmate or parolee to a substantial risk of personal injury or cause other serious and irreparable

21   harm," including "[s]erious and imminent threat to health or safety."  15 Cal. Code Regs. §

22   3084.9(a)(1).  "An emergency appeal shall be submitted directly to the appeals coordinator and

23   shall include a clear description of the circumstances warranting emergency processing."  *Id.*

24   3084.9(a)(2).  Where "emergency processing is warranted, the first level shall be waived and the

25   second level review shall be completed within five working days."  *Id.* 3084.9(a)(4).

26        Plaintiff's appeal log number log number SVSP HC 19001181 did not explicitly request

27   emergency processing, but it did clearly explain that Plaintiff was receiving ongoing involuntary

28

United States District Court
Northern District of California

medication.[5]  ECF No. 29-4 at 21.  It was not processed as an emergency appeal.  *Id.*  The former regulations do not specifically state whether the prisoner has the responsibility of requesting an emergency appeal, or whether reviewing staff must screen each appeal for emergency content regardless of whether emergency treatment is requested.[6]  The regulations both provide instructions for requesting emergency treatment, and dictate that emergency treatment "shall" ensue where the circumstances warrant it.  The fact that Plaintiff was challenging ongoing involuntary medication should have been adequate to result in emergency processing of his appeal.[7]  The involuntary administration of anti-psychotic medication is a serious matter with a "unique nature . . . and . . . attendant liberty interest," *United States v. Williams*, 356 F.3d 1045, 1056 (9th Cir. 2004), and it cannot be reversed.  The Ninth Circuit emphasized the irreversible nature of involuntary medication when it overturned a district court's decision to exercise *Younger* abstention, holding that the irreparable harm exception to the *Younger* doctrine applied:

> [T]he forcible injection of antipsychotic drugs constitutes a "particularly severe" invasion of liberty. [*Riggins v. Nevada*, 504 U.S. 127, 134 (1992).] First, antipsychotic drugs "'tinker[ ] with the mental processes,' affecting cognition, concentration, behavior, and demeanor." *United States v. Williams*, 356 F.3d 1045, 1054 (9th Cir. 2004) (alteration in original) (citation omitted) (quoting *Mackey v. Procunier*, 477 F.2d 877, 878 (9th Cir. 1973)).  "While the resulting personality change is intended to, and often does, eliminate undesirable behaviors, that change also, if unwanted, interferes with a person's self-autonomy, and can impair his or her ability to

---

[5] In addition, Plaintiff stated in his response to the ILR on December 25th, 2019, "If the medication is not terminated, I will take it as a threat to my health and safety."  ECF No. 29-4 at 22.  Plaintiff's explicit invocation of his health and safety does not appear to have triggered any emergency or faster processing of his appeal at the third level either, which was not closed until February 13, 2020.  *Id.* at 6.

[6] The new regulations place the responsibility of screening a grievance for emergency content more squarely on prison officials.  They require "at least one official to assess each written grievance within one business day of receipt to determine if it contains any information concerning personal safety, institutional security, or sexual misconduct."  15 Cal. Code Regs. § 3483.  If it does, "the official shall immediately commence an appropriate response as required by all applicable laws and regulations," and notify the prisoner "of the Department's course of action within five business days."  *Id*

[7] Defendant argues on reply that "Plaintiff does not allege his health was in imminent danger, nor that he was at risk of great injury," and cites a portion of the transcript of Plaintiff's deposition that is not in the summary judgment record in front of this Court.  ECF No. 32 at 4 n.1.  Even if the cited deposition testimony were in the record, it would raise a genuine dispute of material fact, as Plaintiff contends that he feared for his health.

> function in particular contexts." *Id.* Second, antipsychotic drugs
> "can have serious, even fatal, side effects," including irreversible
> neurological disorders . . .
>
> . . . Bean's right to avoid forcible administration of antipsychotic
> medications cannot be fully vindicated after trial.

*Bean v. Matteucci*, 986 F.3d 1128, 1134–35 (9th Cir. 2021).  Here, prison officials' failure to

follow CDCR regulations requiring emergency processing of Plaintiff's appeal rendered the

remedy "effectively unavailable."  *See Nunez v. Duncan*, 591 F.3d 1217, 1226 (9th Cir. 2010).

Although Defendant points out that Plaintiff "has extensive experience with the appeals

process and has filed an estimated 200 appeals while in prison," ECF No. 29 at 16, Defendant

points to no evidence of Plaintiff's ability to make use of the emergency appeals process.  The

Gates declaration shows that Plaintiff explicitly sought emergency action in one of his 31 health

care appeals, log number SVSP HC 19000808 received on July 12, 2019, but the grievance was

not processed as an emergency; an Institutional Level determination was not made until

September 16, 2019; and a Headquarters' Level determination was not made until December 13,

2019.  ECF No. 29-4 at 7.  The emergency appeals process appears to have been "so opaque" that

it was practically unavailable.  *Ross*, 578 U.S. at 643.  Had Plaintiff's appeal been appropriately

processed as an emergency, he might have received a final determination prior to filing suit.  By

the time he did file suit, approximately one month after submitting his grievance, it was apparent

that the grievance was not being processed as an emergency.  Summary judgment on the basis of

lack of exhaustion is therefore not appropriate.

**B.      Due Process Right to Avoid Involuntary Administration of Antipsychotic Drugs**

The Supreme Court has recognized a liberty interest in freedom from the administration of

unwanted antipsychotic drugs.  *Washington v. Harper*, 494 U.S. 210, 221-22 (1990); *United States

v. Ruiz-Gaxiola*, 623 F.3d 684, 691 (9th Cir. 2010).  For convicted prisoners, or those awaiting

trial, the "liberty interest in avoiding unwanted medication must be defined in the context of the

inmate's confinement."  *United States v. Loughner*, 672 F.3d 731, 745 (9th Cir. 2012) (quoting

*Harper*, 494 U.S. at 222).  If it is determined that a prisoner is a danger to himself or others, and

treatment is in his medical interest, the Due Process Clause allows the State to treat an inmate with

serious mental illness with antipsychotic drugs against his will.  *Harper*, 494 U.S. at 227; *cf.*
*Riggins v. Nevada*, 504 U.S. 127, 135 (1992) ("forcing antipsychotic drugs on a convicted prisoner
is impermissible absent a finding of overriding justification and a determination of medical
appropriateness.").

 To comport with due process, the government must show both the need for, and medical
appropriateness of, antipsychotic medication.  *Riggins*, 504 U.S. at 135 (recognizing that due
process would have been satisfied had the State shown, and the federal court found, that the forced
medication was "medically appropriate," and "considering less intrusive alternatives, essential for
the [detainee's] safety or the safety of others.").  In the context of *Harper* and *Riggins*, an invasion
of the human person can only be justified by a determination by a neutral factfinder that the
antipsychotic drugs are medically appropriate and that the circumstances justify their application.
*See Kulas v. Valdez*, 159 F.3d 453, 455-56 (9th Cir. 1998).

 In addition to the substantive requirements above, the administration of antipsychotic
drugs "cannot withstand challenge if there are no procedural safeguards to ensure the prisoner's
interests are taken into account."  *Harper*, 494 U.S. at 233.  A prisoner must be given notice and
the right to be present at and participate in a hearing.  *See Kulas*, 159 F.3d at 456.  But these
procedural safeguards may not apply in an emergency situation where the prisoner poses an
imminent and serious danger to himself or others.  *See id.* (differentiating plaintiff's case from one
where officials could demonstrate a prisoner "posed such an imminent and serious danger to
himself or others that the minimal procedural requirements of *Harper*—notice and the right to be
present at and participate in a hearing—could not be met").

 *Harper*, *Riggins*, and *Loughner* all addressed the requirements for non-emergency
medications, and the Ninth Circuit has not explicitly addressed the application of these standards
to emergency contexts.  *See Brozik v. Kalish*, 942 F.2d 790 (9th Cir. 1991) (reversing qualified
immunity because "injecting antipsychotic drugs without the inmate's consent in the absence of
adequate procedural safeguards and in the absence of an imminent threat to the patient or to others
violated clearly established law of which a reasonable person would have known," and noting in
dicta that "courts have recognized [that] it would be unreasonable to demand of physicians that

United States District Court
Northern District of California

16

they go through elaborate procedural stages when faced with an emergency").

The Fourth Circuit has applied qualified immunity to a decision to administer involuntary medication on an emergency basis, noting that "even Justice Stevens in dissent [in *Harper v. Washington*] appeared to recognize that an inmate could be medicated on an emergency basis without a due process hearing, on the strength of a responsible physician's medical judgment that such medication was in the best interest of the inmate." *Hogan v. Carter*, 85 F.3d 1113, 1117 (4th Cir. 1996). The Fourth Circuit also noted that "the principles informing the decision in *Harper*," including that due process is context-specific, suggest that process was adequate where a licensed psychiatrist familiar with the plaintiff made a medical determination that a one-time dose of involuntary medication was necessary to prevent the plaintiff from imminent self-harm. *Id.* Courts have not opined on how long emergency pre-hearing medication can last. The emergency period referred to by Justice Stevens in his *Harper* dissent as authorized by Washington's Special Offender Center policy was 72 hours, *Hogan* dealt with a single emergency dose of Thorazine, and *Brozik* did not identify how long an emergency can last or what constitutes an imminent threat. Nor does the federal regulation pursuant to which the plaintiff was initially medicated in *Loughner*, the former version of 28 C.F.R. § 549.43, define how long an emergency can last— only that it constitutes a situation in which "a person is suffering from a mental illness which creates an immediate threat of bodily harm to self or others, serious destruction of property, or extreme deterioration of functioning secondary to psychiatric illness." 28 C.F.R. § 549.43(b) (amended Aug. 12, 2011).

A determination that an inmate can be properly involuntarily medicated due to dangerousness need not be made by a judicial decision or judicial hearing as opposed to an administrative determination. *Loughner*, 672 F.3d at 754; *but see id.* (when the forced medication is to render a defendant competent for trial, a higher standard is required in order to consider alternative means). Further, the decision to forcibly medicate because of dangerousness need not meet any heightened standard of proof in order to comport with due process. *Id.* at 756. Nor is an inmate, medicated under the *Harper* standard, entitled to counsel at the involuntary medication hearing. *Id.* at 756-57.

In California, the procedural requirements for involuntary medication of prisoners are set out in *Keyhea v. Rushen*, 178 Cal. App. 3d 526 (1986), and California Penal Code section 2602.[8] "A *Keyhea* order permits the long-term involuntary medication of an inmate upon a court finding that the course of involuntary medication is recommended and that the prisoner, as a result of mental disorder, is gravely disabled and incompetent to refuse medication, or is a danger to himself or others." *Davis v. Walker*, 745 F.3d 1303, 1307 n.2 (9th Cir. 2014).

Section 2602 authorizes emergency or interim involuntary medication where "there is a sudden and marked change in an inmate's mental condition so that action is immediately necessary for the preservation of life or the prevention of serious bodily harm to the inmate or others, and it is impractical, due to the seriousness of the emergency, to first obtain informed consent." Cal. Pen. Code § 2602(d). The physician may only administer as much medication as is "required to treat the emergency condition" and only for as "long as the emergency continues to exist." *Id.* If the physician believes that pre-hearing medication is necessary for longer than 72 hours, "the department shall give notice to the inmate and his or her counsel of the department's intention to seek an ex parte order to allow the continuance of medication pending the full hearing." *Id.* This is required unless "[t]he inmate gives informed consent to continue the medication" during the first 72 hours. *Id.* After receiving the notice, the prisoner and counsel are provided two business days to respond. "An administrative law judge shall review the ex parte

---

[8] The California legislature replaced the *Keyhea* process with Penal Code Section 2602 in 2011. *See* 2011 Cal. Legis. Serv. Ch. 665 (A.B. 1114). The *Keyhea* injunction required the following:

> In order for an individual to be involuntarily medicated in excess of three days, a notice of certification must be signed by both the chief psychiatrist at the treatment facility and a physician or psychologist who participated in the evaluation of the prisoner, and it must be delivered to the prisoner. The notice of certification permits involuntary medication of the prisoner for no more than 21 additional days, and the prisoner is entitled to a certification review hearing within 10 days of the initial involuntary medication . . . Involuntarily medication more than 24 days after the initial medication requires a court order.

*Hendon v. Ramsey*, No. CIV. 06CV1060-J(NLS), 2009 WL 3213928, at *1 (S.D. Cal. Aug. 14, 2009), *report and recommendation adopted*, No. 06CV1060 J 0NLS), 2009 WL 3151134 (S.D. Cal. Sept. 29, 2009).

United States District Court
Northern District of California

1    request and shall have three business days to determine the merits of the department's request for

2    an ex parte order. If an order is issued, the psychiatrist may continue the administration of the

3    medication until the hearing . . . is held." *Id.* The order "may be issued ex parte upon a showing

4    that in the absence of the medication the emergency conditions are likely to recur." *Id.* The statute

5    is ambiguous as to whether an ex parte order is required for any medication after 72 hours, or

6    whether the order must issue by five business days—two days for the prisoner to object and

7    another three days for the administrative law judge to make a determination.[9]

8         Section 2602 authorizes involuntary medication on a non-emergency basis where (1) "[a]

9    psychiatrist has determined that the inmate has a serious mental disorder," (2) the "psychiatrist has

10   determined that . . . the inmate is gravely disabled and does not have the capacity to refuse

11   treatment with psychiatric medications or is a danger to self or others," (3) the psychiatrist "has

12   prescribed one or more psychiatric medications for the treatment of the inmate's disorder," and

13   "determined that the treatment alternatives to involuntary medication are unlikely to meet the

14   needs of the patient," (4) "[t]he inmate has been advised of the risks and benefits of, and treatment

15   alternatives to, the psychiatric medication and refuses or is unable to consent to the administration

16   of the medication," (5) the prisoner is provided a hearing before an administrative law judge, (6)

17   the prisoner is provided counsel within a specified time frame, (7) the prisoner and counsel are

18   provided notice of the hearing within a specified time frame, (8) the "administrative law judge

19   determines by clear and convincing evidence that the inmate has a mental illness or disorder, that

20   as a result of that illness the inmate is gravely disabled and lacks the capacity to consent to or

21   refuse treatment with psychiatric medications or is a danger to self or others if not medicated, that

22   there is no less intrusive alternative to involuntary medication, and that the medication is in the

23

24   _____

     [9] Previously, section 2602 permitted emergency involuntary medication
25

26                  for only so long as the emergency continues to exist, but in no event
                    longer than five days after the written notice and counsel are provided
27                  . . . unless the department first obtains an order from an administrative
                    law judge authorizing the continuance of medication beyond five
                    days.
28
     Cal. Penal Code § 2602 (Effective Jan. 1, 2012).

                                                    19

inmate's best medical interest," taking into account (9) the prisoner's mental health history.  Cal. Pen. Code § 2602(c)(1)-(9).  The prisoner is entitled to a motion for reconsideration or to seek a new hearing to present new evidence.  *Id.* § 2602(c)(10).

Here, Plaintiff received medication both before his section 2602 hearing and after the hearing.  ECF 29-5 at 3-4.

### 1.    Plaintiff's Pre-Hearing Medication

Plaintiff undisputedly assaulted another prisoner on October 14, before Defendant initiated involuntary medication.  Defendant has also provided evidence that Plaintiff had psychosis and schizophrenia and a history of assaultive and violent behavior (including the 2018 battery charge that led to Plaintiff being committed to the Department of State Hospitals).  Defendant's clinical opinion was that medication would decrease Plaintiff's risk of harm to himself and others.  The risk-of-serious-bodily-harm standard from the state code and the imminent-and-serious-danger standard from *Kulas* are therefore likely met here to allow for at least the initiation of emergency medication.

The question remains whether Plaintiff received adequate procedural due process before and while he was subjected to pre-hearing involuntary medication.  Before the hearing, Plaintiff was given the "choice" between receiving an involuntary injection or taking an oral medication.  ECF No. 29-5 at 3.  Although he "eventually agreed" to take the oral medication, his agreement was the product of coercion—he agreed to oral medication instead of forced injections—and likely did not constitute "informed consent" within the meaning of the state law nor did it constitute voluntary medication for purposes of a federal due process analysis.  *See Kulas*, 159 F.3d at 455 (noting that plaintiff "did not resist" oral medication "[i]n the light of" a prior forcible injection).  Plaintiff took the oral medication daily from October 14 until October 23, except for October 17, when he "refused the oral medication and was not forcibly medicated."  ECF No. 29-5 at 3-4.  Plaintiff states he was capable of informed consent during that time and had declined the medication.  ECF No. 30 at 3.

Defendant has presented evidence that Plaintiff received a CDCR Form 7363 on October 16 informing him that he had an emergency involuntary medication hearing scheduled on October

United States District Court
Northern District of California

23, 2019 and providing him the name and contact information of his appointed attorney.  ECF No. 29-5 at 17.  While the notice provided to Plaintiff indicates "interim medications allowed," *id.*, and provided him two business days to object to being medicated pending his full hearing, *id.* at 15, the summary judgment record does not indicate whether Plaintiff or counsel submitted an objection, nor does it contain an ex parte order by the administrative law judge allowing continued interim medication prior to the hearing.  Section 2602 requires an ex parte order for any pre-hearing involuntary medication beyond a certain ambiguous time limit.  The time limit is either 72 hours or five business days from the date of service of the petition on the prisoner.  *See* Cal. Penal Code § 2602(d).  CDCR's forms, in contrast, make no reference to an ex parte order and instead indicate that "interim medication[]" is "allowed" when the prisoner has an emergency hearing set. ECF No. 29-5 at 16-17.  CDCR's Form MH-7366, Inmate Rights Notice—Involuntary Medication, provides notice of the right to object to medication pending a full hearing, but does not state that an ex parte order is required for such medication after 72 hours.  *Id.* at 15.  Instead, it implies that the default is continued involuntary medication until the hearing date absent an objection from the prisoner.  CDCR's paperwork appears inconsistent with the statute.

        While failure to follow the state procedures does not necessarily constitute a federal due process violation, it does do so where a liberty interest is implicated.  Due process protection arises from "the Due Process Clause itself" with respect to involuntary psychotropic medication, but state regulations implicating "atypical and significant hardship" on prisoners also create liberty interests requiring procedural protections.  *Sandin v. Conner*, 515 U.S. 472, 484, 487 (1995). Plaintiff therefore does have a due process interest in receiving the protections against involuntary medication afforded both by the *Harper* line of precedent and by the state regulations.[10]  *See id.* at 489 (Justice Ginsburg, dissenting: "I see the Due Process Clause itself, not Hawaii's prison code, as the wellspring of the protection due Conner.  Deriving protected liberty interests from mandatory language in local prison codes would make of the fundamental right something more in certain States, something less in others.").  *C.f. Rogers v. Okin*, 738 F.2d 1, 7–8 (1st Cir. 1984)

---

[10] The requirements of the state code and established CDCR processes are also relevant to the qualified immunity analysis below.

1    ("The determination that state procedural rules create liberty interests under the due process clause

2    does not answer the question of what process is due under the Constitution.  Procedural minima

3    prescribed by the due process clause are not necessarily coextensive with procedures prescribed by

4    state law.  Where state procedures fall below the minimum requirements of the due process clause,

5    those procedures are invalid . . . .  Conversely, if state procedures rise above the floor set by the

6    due process clause, a state could fail to follow its own procedures yet still provide sufficient

7    process to survive constitutional scrutiny.").  To the extent that California's regulations provide

8    greater protection against emergency involuntary medication than the federal constitutional right,

9    federal constitutional due process is required before removing that protection.  Even if there were

10   no constitutional limitations on emergency involuntary medication, California prisoners would

11   nonetheless have a constitutional right to due process with regard to emergency involuntary

12   medication because California has established procedures regarding it.

13        It is undisputed that Plaintiff took oral anti-psychotic medication to which he objected, in

14   lieu of involuntary injections, from October 14 to 23 (with the exception of October 17).  This was

15   well over 72 hours, but only five business days from the October 16, 2019 date of service on

16   Plaintiff, which was a Wednesday, until the October 23 hearing.

17        Whether deriving from the Due Process Clause protection as outlined in *Harper* or from

18   the state code, it is not clear that Plaintiff received adequate process with respect to his pre-hearing

19   involuntary medication.  Plaintiff received involuntary medication for a full ten days before his

20   hearing, far more than discussed by any of the Supreme Court or court of appeals cases

21   mentioning emergency treatment.  The record does not clearly establish that Plaintiff's mental

22   health status remained an emergency that entire time, nor that he continued to be an imminent

23   threat to others.  Under the state regulations, the record is not clear as to whether Plaintiff objected

24   and had his objections considered.  And there is no record of an ex parte order as section 2602

25   contemplates for pre-hearing medication beyond 72 hours.  Defendant has therefore not carried her

26   burden of demonstrating the absence of an issue of material fact.  *See Jefferson v. Helling*, 324 F.

27   App'x 612, 614 (9th Cir. 2009) (summary judgment denied where genuine issue of material fact

28   existed as to whether plaintiff was involuntarily medicated prior to hearing in violation of

22

1    *Washington v. Harper*).

2         Summary judgment is nonetheless appropriate for Defendant with respect to Plaintiff's

3    pre-hearing medication on the basis of qualified immunity.  Even if Plaintiff received less than

4    constitutional process before his hearing—because of a failure to follow state process or because

5    the length of time or the degree imminency of the risk of harm exceeded constitutional bounds—

6    the violation was not clearly established.  There was no clearly established law at the time that

7    Defendant administered Plaintiff's pre-hearing medication that established "beyond debate" the

8    standards for emergency involuntary medication and that Defendant's conduct violated them.  The

9    federal courts have not set a constitutional limit on how long emergency involuntary medication

10   can last.  To the extent that Defendant unconstitutionally deprived Plaintiff of a state-created

11   liberty interest by failing to follow the state statutory scheme, the state scheme and CDCR's

12   interpretations of it are sufficiently ambiguous to confer immunity for the error.  Defendant's

13   reliance on CDCR's interpretation of state law, analogous to an official following an ordinance or

14   statute they believed legal counsel had determined was constitutional, was not unreasonable.  *See*,

15   *e.g.*, *Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994) ("the existence of a statute

16   or ordinance authorizing particular conduct is a factor which militates in favor of the conclusion

17   that a reasonable official would find that conduct constitutional.").  In addition, Defendant could

18   have reasonably believed based on the June 4, 2019 superior court order that Plaintiff had already

19   received all the process required for ongoing involuntary medication.  *See Kulas*, 159 F.3d at 456

20   (qualified immunity appropriate for treating physician who involuntarily medicated plaintiff based

21   on an incorrect but reasonable interpretation of court order).

22        Taking the record in the light most favorable to Plaintiff, Defendant is entitled to qualified

23   immunity with respect to the pre-hearing medication.

24              **2.      Plaintiff's Post-Hearing Medication**

25        After Plaintiff's hearing, the administrative law judge determined that Plaintiff "may be

26   involuntarily administered psychiatric medication," but did not order that he be medicated.  ECF

27   No. 29-1 at 13.  While state officials have quasi-judicial immunity for executing court orders, *see*

28   *Coverdell v. Dep't of Soc. & Health Servs., State of Wash.*, 834 F.2d 758, 765 (9th Cir. 1987),

United States District Court
Northern District of California

1    there was no such order here and Defendant is not entitled to quasi-judicial immunity.

2    Defendant's decision to administer involuntary medication post-hearing, with the

3    administrative law judge's approval, falls squarely within *Harper*'s ambit and meets *Harper*'s

4    standard. At that point, Plaintiff had received a hearing and counsel, and a neutral fact finder (the

5    administrative law judge) had determined, based on the documents and testimony, that involuntary

6    medication was "in [Plaintiff's] best medical interest" and the least intrusive way to prevent

7    Plaintiff from being a danger to others. ECF No. 29-1 at 12.

8    The disputed factual issue of whether Plaintiff stated that he had the right to hit someone is

9    not material; the undisputed assault and his history of other assaultive behavior were adequate to

10   support Defendant's, the Treatment Team's, and the judge's conclusion that he was a danger to

11   others. Nor do Plaintiff's disagreement with Defendant's diagnosis of him or belief that he could

12   have been admonished instead of involuntarily medicated preclude summary judgment regarding

13   the post-hearing medication. The procedural safeguards required by *Harper* were present, and the

14   required findings were made by qualified and appropriate individuals. Taking the record in the

15   light most favorable to Plaintiff, there is no genuine issue of material fact as to whether Defendant

16   violated Plaintiff's constitutional rights by administering involuntary medication after Plaintiff's

17   section 2602 hearing.

18   The Court GRANTS summary judgment in favor of Defendant.[11]

19   ## CONCLUSION

20   For the foregoing reasons, the Court GRANTS Defendant's motion for summary

21   judgment. ECF No. 29. The Clerk is directed to enter judgment in favor of Defendant and against

22   Plaintiff.

23   ///

24   ///

25   ///

26

27   [11] Plaintiff filed a "Return to Defendant's Reply to Plaintiff's Opposition" on July 8, 2021. ECF No. 33. The Court did not rely upon Plaintiff's "return," which for the most part restates prior allegations and arguments, in making its determination, and Defendant's motion to strike the filing

28   (ECF No. 35) is therefore DENIED as unnecessary.

1    This order terminates ECF Nos. 29 and 35.

2    **IT IS SO ORDERED.**

3  Dated:  February 28, 2022



4    _____
                    JON S. TIGAR
5              United States District Judge